No. 58,846

FARMERS COOPERATIVE ASSOCIATION, *Appellant,* v. KANSAS STATE BOARD OF AGRICULTURE, REGINALD HURD, and KENNETH T. BOUGHTON, *Appellees.*

(729 P.2d 1190)

Opinion filed December 5, 1986.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the briefs for appellant.

*Kenneth M. Wilke,* chief counsel, argued the cause and was on the brief for appellee Kansas State Board of Agriculture.

*George E. Erickson, Jr.,* of Erickson & Hall, of Topeka, argued the cause and *Thomas W. Porter,* of the same firm, was with him on the brief for appellee Kenneth T. Boughton.

The opinion of the court was delivered by

McFARLAND, J.: This is an action by plaintiff Farmers Cooperative Association against defendants State Board of Agriculture (Board) and Kenneth T. Boughton, Director of Marketing, seeking to recover damages sustained by plaintiff as a result of an incompleted transaction involving the sale of milo by plaintiff for export to South Korea. The district court entered summary judgment in favor of these defendants and plaintiff appeals therefrom.

In order to make the complex factual background from which this case arises more meaningful, it would be helpful, preliminarily, to summarize the plaintiff's theory of liability against these defendants. An individual named Reginald Hurd telephoned plaintiff's general manager, William J. Warders, on August 22,

1981, and discussed the purchase of a large amount of milo for export to South Korea. Warders then purchased substantial amounts of milo at well over the market price to fill what he believed was a legitimate grain deal sanctioned by the defendants. The sale was not consummated. Plaintiff seeks to hold these defendants liable on the grounds that these defendants gave Warder's name to Hurd as a prospective grain seller without adequately investigating Hurd and engaged in certain misleading activities upon which plaintiff relied to its detriment. In essence, plaintiff contends it would not have purchased the grain but for the wrongful activities of these defendants and that they should be liable to plaintiff for its losses in the aborted Hurd grain transaction. These allegations and the facts relevant thereto will be amplified later in the opinion, but the above summary is sufficient to place the following general background and factual information in focus.

Before proceeding to the specific factual allegations herein, it is necessary to state some general background information and the legal relationship of some of the individuals and agencies involved. The Board is composed of twelve members elected by delegates from various agricultural organizations. The Board elects from its members a president, a vice-president, and a secretary. K.S.A. 74-502, -503. The Division of Markets (Division) is statutorily created within the Board and its chief executive officer, known as the Director of Marketing, is selected by the Board. K.S.A. 74-530 and -533. The creation, powers, and duties of the Division are set forth in K.S.A. 74-530 as follows:

"A division of markets hereinafter referred to as 'the division,' is hereby created within the state board of agriculture. It shall be the duty of the division to perform acts and to do, or cause to be done, those things which are designed to lead to the more advantageous marketing of agricultural products of Kansas. For these purposes the division may, among other things authorized by this act:

(a) Investigate the subject of marketing farm products;

(b) promote their sales distribution and merchandising;

(c) furnish information and assistance to the public;

(d) study and recommend efficient and economical methods of marketing;

(e) provide for such studies and research as may be deemed necessary and proper; and

(f) to gather and diffuse timely and useful information concerning the supply, demand, prevailing prices and commercial movement of farm products including quantity in common storage and cold storage, in cooperation with other public or private agencies."

Additional powers and duties of the Division are set forth in K.S.A. 2-3006, reproduced in pertinent part as follows:

"The division shall have the following duties, authorities and powers:

(1) To implement and coordinate the policies and practices of each grain commission represented by it;

(2) to sue and be sued."

K.S.A. 2-3006(2) grants the Division the power to sue and be sued. Although not raised as an issue by the parties, it would appear that a serious problem arises in this case by virtue of the plaintiff's failure to bring the action against the Division and the Director (Boughton) in his official capacity rather than against Kenneth T. Boughton as an individual and the State Board of Agriculture as his employer. However, under the disposition of the issues herein, we do not deem it necessary to pursue this aspect of the case further.

The Kansas Grain Sorghum Commission (Commission) consists of nine members appointed by the governor and is "attached to" and is "a part of the division of markets of the state board of agriculture." K.S.A. 2-3002. The duties and powers of the Commission are set forth in K.S.A. 2-3005 and include:

"(1) To recommend to the secretary policy regarding marketing, campaigns of development, education and publicity for the Kansas grain commodity and products made therefrom represented by it;

. . . .

"(b) Notwithstanding any provision of this act or other law to the contrary, any determination by the secretary regarding any recommendation by a commission pursuant to subparagraphs one to five of this section may be disapproved by a vote of two-thirds (⅔) of the members of the commission but nothing herein shall be construed as authorizing such commission to abrogate, limit or otherwise affect the power of the secretary to administer and supervise the internal operations and management of the division."

The Chairperson of the Commission, at all times pertinent hereto, was Rudolph A. Vopata.

We turn now to the facts from which this litigation arises. In the spring of 1981, Reginald Hurd contacted Kenneth T. Boughton about arranging a tour of certain Kansas agricultural facilities for representatives of the (South) Korea Feed Grain Association (Association). The tour was to include Kansas State University milling operations. The idea was to establish to the Koreans that milo was an acceptable feed grain substitute for corn and the purchase of Kansas milo would be economically prudent for the Koreans. Boughton had previously arranged for a number of comparable tours. Boughton sent a telex message to

the U.S. Feed Grain Council in Seoul, South Korea, to verify that the Association was a "reliable organization." The response was favorable and so the tour was arranged. The tour ended on May 22, 1981, with what was referred to as a "V.I.P." dinner in honor of the foreign guests. Boughton, Vopata, and Hurd were among the guests. At that dinner, Boughton introduced Hurd to Vopata.

Conflicting evidence is presented as to what was said and not said at the introduction. Plaintiff contends Boughton knew at that time that Hurd did not represent the Association but rather only Intercon Implex, Inc., a California corporation owned by Korean nationals which was interested in bidding and supplying U.S. grain to the Association. Assuming this is true, Boughton did not relay this information to Vopata. Plaintiff contends this was a concealment of a material fact which was a major cause of plaintiff's damages. During the introduction, Boughton told Hurd that Vopata could be of assistance in contacting grain sorghum producers and suppliers.

On August 12, 1981, Intercon became the successful bidder for the Korean grain tender. On or about August 19, 1981, Hurd called Vopata to obtain leads of suppliers. It should be noted that Hurd had told Boughton and Vopata that he did not want to deal with the large experienced grain exporters on the belief the Koreans could acquire the grain cheaper from small suppliers and that a higher price could be paid producers by eliminating the high middle-man charge customary in grain export deals.

As previously stated, Vopata was Chairperson of the Grain Sorghum Commission at the time. He was a milo farmer from the Blue Rapids area and had at times past served as a director and president of plaintiff cooperative. He was a long-time acquaintance of plaintiff's general manager, William Warders. In July 1981, Vopata mentioned a possible Korean grain deal with Hurd. Vopata, on or about August 19, 1981, gave Warders' name to Hurd as an individual to contact relative to the purchase of milo. He told Warders to expect a call from Hurd relative to a large Korean milo sale. Hurd called Warders three times on August 22, 1981. Hurd advised that he could pay $5.00 per CWT for milo when the current market price was $3.65 per CWT. Warders was surprised by the high offer. Three days later, Warders contacted his local banker who verified Hurd had a $4,000,000 letter of credit through a Missouri bank. Warders began buying vast

amounts of milo to fill the Korean order—paying approximately one dollar over market price. No written confirmation of the order was ever received.

Problems developed. The cost of shipping the milo from Blue Rapids to a seaport was prohibitive. Hurd then proposed to exchange the plaintiff's milo for Commodity Credit Corporation (CCC) milo already located at a seaport. To aid in this project, Hurd sought Boughton's assistance in the form of Boughton requesting that Governor Carlin call the CCC to encourage acceptance of the grain swap. The call was made by the Governor. Nothing was worked out and Hurd ultimately purchased milo from a large experienced exporter.

It should be noted that Boughton extended the privilege to Hurd of using the Board of Agriculture's telex equipment during negotiations for the purchase of grain for export. This was standard procedure in such circumstances.

On September 16, 1981, Warders contacted Boughton. This was the first contact between the two and occurred after the Korean grain deal had collapsed.

Numerous issues are raised but the linchpin question is whether a cause of action has been stated against Boughton. Viewing the evidence in the light most favorable to plaintiff, has Boughton breached any legal duty owed to plaintiff which caused or contributed to plaintiff's injury? The answer to this question must be no.

A major part of the Division's duties is to promote the sale of Kansas grain. In this regard, the Division tries to put potential buyers of grain in contact with potential sellers. The Division is not a guarantor of performance by either seller or buyer. True, Boughton did not tell Vopata that Hurd represented a California corporation rather than Korean feed dealers and that the corporation was only a bidder on a grain tender. However, it should be recalled the corporation had been the successful bidder prior to any contact between Hurd and Warders. A $4,000,000 letter of credit was in place with a Missouri bank by the time of first contact. The Division will make investigations of potential purchasers if requested to do so. Warders never requested any assistance in this case and made no inquiry on his own other than the letter of credit check through his own bank. Rather, Warders received telephone calls from a stranger (Hurd) to him and

started buying grain in response thereto. He stated Vopata and Hurd led him to believe Hurd worked for the Grain Sorghum Commission. Warders' deposition testimony concerning his August 22, 1981, telephone conversations with Hurd is illuminating. He states in part:

"Q. [By Mr. Wilke, Board's attorney] . . . Did Mr. Hurd say who he was working for?

"A. As I best recall he led me to believe that he was working—and I don't recall now exactly whether he said for or with the Kansas Grain Sorghum Commission. And he also I guess left me with the impression that he also was working with or for the Korean Feed Association.

"Q. Now, you say with or for, which is it?

"MR. FABERT [attorney for appellant]: In which case, counsel? We have two different recommendations.

"Q. (BY MR. WILKE) With or for the Grain Sorghum Commission? Was he working with them or working for them?

"A. I took it that he was working for the Grain Sorghum Commission.

"Q. Did he specifically identify that he was working for the sorghum commission or was that an assumption on your part?

"MR. FABERT: Are we limiting this to the August 22 conversation?

"MR. WILKE: That's correct. I'm still on the August 22 conversation.

"A. Well, as I best recall the way he worded it to me was that he was working for the Grain Sorghum Commission.

"Q. (BY MR. WILKE) How long did this conversation last?

"A. As I best recall approximately five minutes.

"Q. Five minutes. How much grain did you tell him that your co-op could supply?"

"A. I told him I thought I could originate 100, 125,000 bushel.

"Q. Did you have authority on behalf of the co-op to supply that much without going before your board of directors or corporate officers?

"A. Yes, sir.

. . . .

"Q. Did it seem strange to you that he would offer you better than a dollar over market?

"A. Yes, it did.

. . . .

"Q. Did you consider what might have happened if the deal fell through?

"A. I didn't really have time.

. . . .

"Q. . . . Did Mr. Boughton ever do anything to induce you to enter into a grain deal with Mr. Hurd?

"A. Did Mr. Boughton?

"Q. Yes.

MR. FABERT: To the personal knowledge of the witness you mean?

MR. WILKE: yes.

"A. No."

Plaintiff attempts to categorize Vopata as some type of agent of

Boughton in this transaction and thus render Boughton liable for any misleading statements made by Vopata. It contends Vopata misled Warders by general statements from which he inferred Hurd was working for the Grain Sorghum Commission as well as the Korean purchaser. Hurd could hardly have served in both capacities, yet plaintiff made no effort to establish Hurd's true capacity. Likewise, the statutes previously cited clearly rule out attributing statements of Vopata to either Boughton or the Board under the doctrine of respondeat superior. These statutes show that Vopata, as Chairperson of the Grain Sorghum Commission, was not the employee of the Division of Markets or the Board of Agriculture. The Division of Markets serves the Grain Commission in implementing policies. Members of the Commission are directly appointed by the governor.

We conclude the district court correctly held that Boughton breached no legal duty to plaintiff. Defendant Board is present in this action only under the claim of respondeat superior. Therefore, the district court properly entered summary judgment in favor of both defendants.

It is unfortunate that plaintiff cooperative suffered the loss herein. However, the fact that the prospective purchaser was given plaintiff's name as a prospective seller by the Chairperson of the Grain Sorghum Commission does not relieve the plaintiff of the obligation to conduct its affairs with proper business-like prudence and caution. The ultimate decision of whether or not to do business with Hurd was plaintiff's, and responsibility for that decision cannot be shifted to third parties under the facts herein.

Other issues raised need not be discussed in view of this determination.

The judgment is affirmed.